# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JESSE FRANK,

            Plaintiff,

v.

JOSH SCHOEMANN, JOSH GLASS, and SCOTT SCHMIDT,

            Defendants.

Case No. 20-CV-1293-JPS

**ORDER**

## 1. INTRODUCTION

On August 21, 2020, Plaintiff Jesse Frank ("Frank") filed the present civil rights action, alleging that Defendants wrongfully terminated him from his position with the Washington County Highway Department. ECF No. 1. On March 31, 2022, Defendants filed a motion for summary judgment. ECF No. 29. That motion is fully briefed, and the Court will grant it.

## 2. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing

the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

## 3. RELEVANT FACTS[1]

### 3.1 Frank's Employment Background

Frank is an adult resident of the State of Wisconsin who resides within the Eastern District of Wisconsin. Defendant Josh Schoemann ("Schoemann") is the County Executive for Washington County (the "County") and has held that position since April 21, 2020. Schoemann was previously employed as the Washington County Administrator, a position he held from January 2014 until April 20, 2020. The County is a municipal corporation organized and operating under Chapter 59 of the Wisconsin statutes. Defendant Scott Schmidt ("Schmidt") was formerly the Washington County Highway Commissioner; his title changed to Director

---

[1] The parties submitted a stipulated statement of undisputed material facts. ECF No. 30. On April 26, 2022, ignoring the Court's dispositive-motions order, which ordered the parties to submit a "*single*" agreed-upon statement of facts, ECF No. 28 (emphasis added), Frank submitted his own "proposed stipulated findings of fact," ECF No. 38, and another statement of facts in his response brief, ECF No. 35 at 2–9. Frank's decision to submit additional pages of stipulated facts conflicted with both the letter and spirit of the Court's dispositive-motions order.

Frank's statement of facts also conflicts with facts in the parties' stipulated statement of undisputed material facts. For example, the parties agree that "Frank did not share a copy of the email with anyone or tell anyone that he was going to send the email before he sent it to [] Schoemann." ECF No. 30 ¶ 33. Frank's statement of facts states that "Frank was not just speaking for himself, but he was speaking for other public employees." ECF No. 35 at 4. These statements are conflicting, yet Frank has agreed to both.

The Court will rely on the parties' stipulated statement of undisputed material facts, ECF No. 30. This is the more cogent set of facts and most closely followed the Court's directives.

of Public Works as of January 1, 2020, but, even after he was given the title of Director of Public Works, Schmidt still functioned as the County's Highway Commissioner. Defendant Josh Glass ("Glass") is the Washington County Assistant Highway Commissioner; he reports directly to Schmidt. Frank began his employment with the County on or about August 26, 2019, as a Highway Laborer working for the Washington County Highway Department.

In the position of Highway Laborer, Frank's general job duties involved snowplowing, repairing potholes, crack filling, picking up garbage, trimming trees, chipping, cutting grass, and other general highway maintenance duties. Frank was hired to work out of the West Bend shop of the Washington County Highway Department. Frank reported directly to Tim Pfeifer ("Pfeifer"), the Patrol Superintendent in the West Bend shop; Pfeifer reported directly to Glass, who in turn, reported to Schmidt.

Frank started at an hourly rate of $21.23 per hour, plus standard County benefits, which included health, dental, term-life insurance, short-term disability, long-term disability, paid time off ("PTO"), paid holidays and participation in the Wisconsin Retirement System ("WRS"). Frank did not attempt to negotiate a higher salary when he was offered the position with the County.

As of May 2020, Frank was scheduled to work first shift, which ran from 6:30 a.m. to 4:30 p.m., Monday through Thursday. Frank was required to punch in at the start of his shift and punch out at the end of his shift using either a swipe card or a keypad that was located inside the West Bend highway shop.

### 3.2 County's Furlough Plan

In April 2020, Schoemann made the decision to implement a mandatory furlough program, in which all County employees (except for selected essential and emergency positions) were required to take a total of five unpaid furlough days from the County. The furlough days could be scheduled by each individual employee, but they had to be taken prior to December 31, 2020. The decision was one of County policy; it was made largely in light of the COVID-19 pandemic. In his report to the County's Executive Committee, Schoeman stated, "[t]he people of our county are suffering right now, and the last thing we ought to do is to create a situation where we have to consider any additional tax burdens on them."

The furlough plan was communicated to all County employees through a public Town Hall Meeting on or about April 23, 2020, which was a virtual meeting in which Schoemann was able to explain the furlough program and why it was being implemented, as well as answer any employee questions. Frank attended the Town Hall meeting virtually, but he did not ask any questions of Schoemann during the meeting. Frank does not recall any specific conversations he may have had with any employees at the Highway Department following the Town Hall meeting, but he does recall "shop talk" in which employees in the Highway Department expressed being generally unhappy with the County's furlough plan. Frank understood that employees were upset because they were being forced to take unpaid furlough days, which directly affected their salaries. Frank was also upset about losing a week of pay as a result of the mandatory furlough program.

### 3.3 Frank's May 4, 2020 Email

Frank was scheduled to work from 6:30 a.m. until 4:30 p.m. on May 4, 2020. As a Washington County Highway worker, Frank was entitled to take a thirty-minute paid lunch break, which he typically took around 11:30 a.m. or 12:00 p.m. During his lunch break on May 4, 2020, Frank drafted an email to Schoemann. Frank drafted the email using his personal email account (Frank did not have a Washington County email account). Frank was alone when he drafted the email; he sat in a County-provided truck when he drafted the email. Even though he was on a lunch break, Frank was still on-the-clock and being paid by the County when he drafted the email. On May 4, 2020 at 4:29 p.m., Frank sent the email to Schoemann. It stated as follows:

> Glad to see the money the county is saving by forcing employees to take furlough days is getting put to good use paving county property… That could be pushed off till next year so you could take care of your employees like all the surrounding countys [sic]. You saying the furlough is so you can give raises we are all wise tou [sic] your line of bs. We all know there will be no raises this year and even if you would give raises it wont [sic] cover the lost money from 40hrs of furlough. Us peeons [sic] don't make $200k a year like you. I'll be lucky to clear $25k here. None of us are looking to get rich but want to be able to make a living and be able to pay our bills.

Frank punched out from work at 4:31 p.m. on May 4, 2020. Despite the two-minute time difference, Frank claims that he sent the email right after he punched out and walked out the door at the Highway Department. Frank did not share a copy of the email with anyone or tell anyone that he was going to send the email before he sent it to Schoemann. Frank did not

receive permission from any of his co-workers at the Highway Department to send the email on their behalf.

Frank sent the email to Schoemann because Schoemann was the one who communicated the furlough policy to him and the other County employees. The only parking lot that Frank could identify as being repaved during the time frame that he sent the email was a lot by the fuel pumps, which was only used by employees of the Highway Department, County taxi service, and Sheriff's Department personnel who needed to refuel their vehicles. Frank made the written statement, "even if you would give raises it wont [sic] cover the lost money from 40 hrs of furlough," after calculating whether a raise would cover the money that he lost because of the mandatory furlough. In making the statement "I'll be lucky to clear $25k," Frank also did some rough math on his personal net take-home pay. As of May 4, 2020, as the elected County Executive, Schoemann was paid an annual salary of approximately $129,000 by the County.

### 3.4 The County's Response to the May 4, 2020 Email

On May 5, 2020, after receiving the email and being unfamiliar with Frank, Schoemann sent an email to the County's human resources director, Todd Scott ("Scott"), copying the County's director of administration, David Barber ("Barber"). Therein, Schoemann asked who Frank was. Scott responded that that Frank was a "Highway laborer in West Bend," who had "[s]tarted in August last year." Schoemann responded back to Scott, "[t]hank you. Good to know who I am communicating with."

Scott then called Schmidt and informed him that Frank had sent an email to Schoemann. Scott did not provide Schmidt with a copy of Frank's email, but Scott provided Schmidt a summary of the contents of the email. Schmidt then had a conversation with Glass to gather information on Frank

Page 6 of 14
Case 2:20-cv-01293-JPS   Filed 05/31/22   Page 6 of 14   Document 42

(i.e., Frank's employment history and overall attitude). Schmidt then contacted Schoemann by telephone and informed him that Frank had been with the County for approximately seven months; that there had been other performance concerns with Frank; and that the Highway Department would handle the situation. Pfeifer informed Schmidt that Frank came to work on time and came in when called. Pfeifer also stated that he was a little concerned about Frank's "ambition" and ability to follow a chain of command, specifically in regard to Frank jumping the sequence of command by emailing Schoemann instead of Pfeifer, Schmidt or Glass. It appears, however, that Frank had told Pfeifer about his concerns over the furloughs earlier, but Pfeifer did not send those concerns up the chain of command.

Schoemann never responded to Frank's May 4, 2020 email. Schoemann never told Schmidt (or anyone else) how the County should respond to Frank's email, nor did he express whether any discipline should be imposed on Frank. Glass asserts that he ultimately made the decision to recommend the termination of Frank's employment based on a culmination of events, including a definite trend of negativity that he believed needed to be eliminated from the workforce (for example, one time, Frank refused to work a mandatory assignment at the County's polling place during the most recent election).

Glass' decision to recommend the termination of Frank was based in part on these performance concerns, but the email from Frank was the proverbial "straw that broke the camel's back." After he had reached his decision, Glass informed Schmidt that he believed it was appropriate to terminate Frank's employment. Schmidt agreed with the termination recommendation.

Although Schmidt had previously been supervised by Schoemann, by the time the termination decision was reached, Schmidt was no longer directly supervised by Schoemann. Schmidt believes that Frank's email was insubordinate in that he went outside the department rather than directing the email inside the department. The County's Code of Conduct provides, in relevant part, that employees are expected to "[h]onor public office by behaving with courteous behavior and respect for the dignity of others in interactions with elected officials, employees, citizens and the media."

### 3.5 Termination Meeting

On May 6, 2020, Frank was working in the field when Pfeifer advised him that he was needed for a meeting back in the West Bend shop. Although he was not told so, Frank believed that the meeting related to the email he had sent two days earlier (Frank now admits that the tone of the May 4, 2020, email was harsh and that he could have worded it differently). Once he arrived back in the shop, Frank attended a meeting with Erin Jasinski (Human Resources Generalist), Schmidt and Glass, during which he was informed that his employment with the County was being terminated. During the meeting, Glass read the termination letter and provided Frank with a copy of the letter, which stated that he was being terminated for violations of the County Code of Ethics and for insubordination. In a first draft of the letter, it read that "[t]he final act of incident was the insubordinate email you sent to the County Executive during work hours." Scott removed this reference to the email from the final draft of the termination letter presented to Frank. In its final form, the letter

Page 8 of 14
Case 2:20-cv-01293-JPS   Filed 05/31/22   Page 8 of 14   Document 42

stated, "[t]his termination is a result of violations of our County Code of Ethics and insubordination."[2]

Schoemann had no direct involvement in the decision to discipline or to terminate Frank's employment. In a post termination email, Frank stated that the email to Schoemann was sent while he was "sitting in [his] personal truck," which was not a truthful statement. In the same email, Frank also wrote that he did not believe that his conduct warranted his termination, but rather "[a]t very most I could see a 3 day suspension." Schoemann stated in a deposition that he did not find Frank's email to be offensive; for example, he found the use of certain placeholders for profanity (e.g., "bs") to be unoffensive, especially coming from a highway employee who often use such language without discipline.

Frank asserts that he sent the email to Schoemann because he felt that Schoemann was making the wrong decision. Even though the furlough was personally impacting Frank, Frank felt the county was being unfair to county employees, who were also people in the community.

4.  ANALYSIS

Frank claims that Defendants fired him in retaliation for exercising his First Amendment rights, namely engaging in constitutionally protected speech. Defendants argue that Frank was not engaged in constitutionally protected speech when he sent his email, and, therefore, he cannot proceed

---

[2] Section 2(d) of the Code reads, in part:

> (d) A public official performs the duties of the office with fairness and impartiality to build public confidence in government and should:
>
> (1) Promote County business practices which contribute to public perception of the impartiality of County decisions.

on a claim that he was retaliated against in violation of the First Amendment.

For a First Amendment retaliation claim to survive summary judgment, a plaintiff must establish, among other things, that his speech was constitutionally protected. "Whether public-employee speech is protected is determined by reference to the two-part *Connick-Pickering* test." *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (citing *Connick v. Myers*, 461 U.S. 138 (1983); *Pickering v. Bd. of Ed.*, 391 U.S. 563 (1968)). Under the first prong, a court asks "whether the employee spoke as a citizen on a matter of public concern." *Id.* (internal quotation and citation omitted). The Supreme Court, in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), clarified that under this first prong, a plaintiff can only prevail if he was speaking as a citizen, not as an employee. *See Spiegla*, 481 F.3d at 965 (discussing *Garcetti*, 547 U.S. 410). "[P]ublic employees speaking 'pursuant to their official duties' are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech." *Id.* (quoting *Garcetti*, 547 U.S. at 421). As to whether speech was on a matter of public concern, the First Amendment "does not empower [employees] to 'constitutionalize [an] employee grievance.'" *Garcetti*, 547 U.S. at 420 (quoting *Connick*, 461 U.S. at 154).

If an employee can demonstrate that he was speaking as a citizen on a matter of public concern, the second prong of the *Connick-Pickering* test "requires a balancing of the employee's interest as a citizen in commenting on the matter against the public employer's interest as [an] employer [] in promoting effective and efficient public service." *Id.* (internal quotations and citations omitted). This is an often difficult inquiry. In the Court's final inquiry, it must consider that "[s]o long as employees are speaking as

Page 10 of 14
Case 2:20-cv-01293-JPS    Filed 05/31/22    Page 10 of 14    Document 42

citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419.

The Court will focus on prong one, specifically whether Frank's email was on a matter of public concern. The case law in this Circuit maintains that "the fact that an employee speaks up on a topic that may be deemed one of public import does not automatically render [his] remarks on that subject protected." *Cliff v. Bd. of Sch. Comm'rs of City of Indianapolis*, 42 F.3d 403, 409–10 (7th Cir. 1994). "*Connick* requires that we consider the content, form, and context of [the employee's] statements as revealed by the record as a whole . . . and our cases indicate that of these three, content is the most important." *Id.* (internal quotation and citation omitted). "[T]he public concern element is lacking as a matter of law if speech 'concerns a subject of public interest but the *expression* addresses only the personal effect upon the employee." *Id.* (quoting *Marshall v. Porter Cnty. Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994)). It is incumbent on a court to determine whether the employee was speaking "more like a citizen or a disgruntled employee whose statements are primarily of personal interest." *Colburn v. Trustees of Ind. Univ.*, 973 F.2d 581, 585 (7th Cir. 1992).

Defendants rely on *Murray v. Gardner*, 741 F.2d 434, 438 (D.C. Cir. 1984), to argue that the County's furlough policy was not a matter of public concern but instead a purely personal grievance. In *Murray*, the FBI planned a furlough because of funding delays. 741 F.2d at 435. The furloughed employees were to be by randomly selected by a lottery system, irrespective of seniority; the plan was set to impact about one-third of the agents. *Id.* At a conference with employees about the furlough program, Murray complained that the lottery system was unfair, namely because it ignored

seniority. *Id.* at 435–36. Murray also complained that he had received veiled threats to his employment related to his opposition to the furlough plan. *Id.* The FBI investigated Murray's claim that he had been threatened and disciplined Murray when it discovered that his allegations were baseless. *Id.* 436–37. The Court of Appeals of the District of Columbia upheld the district court's grant of summary judgment on the basis that Murray's speech was not on an issue of public concern but instead was a private grievance about a system under which some employees would win and some would lose. *Id.* at 438 ("[T]he furlough plan was purely a labor relations matter, an arrangement of employees under which some would win and some would lose.").

*Murray* shares many facts with the present case. Both Frank and Murray complained about their government employer's furlough policies. They cited unfairness in the administration of the plan (Murray discussed senior versus junior employees; Frank discussed higher- versus lower-paid employees). Both cited concerns about how the furlough policies would affect them individually. Both criticized their employers for even needing to institute a furlough policy. Unlike the FBI (which gathered an employee-only meeting to discuss the furlough policy), however, the County affirmatively opened the furlough policy up to public discussion by hosting a public town meeting. Citizens were invited to speak on the issue at the public hearing. In that context, it is arguable that Frank cites his own wage-and-hour concerns merely as an *example* of why the furlough system was an inequitable public policy.

But while Frank may have intended his email to change a public policy and, thereby, benefit other similarly situated government employees, "motive cannot rise to the level of an absolute litmus test

because it does not supplant *content* in terms of overall importance to the public concern inquiry." *Cliff*, 42 F.3d at 410 (emphasis added). In his email, Frank primarily discusses salary differences between two persons: himself and Schoeman. He uses words like "we," "us," and "our" in reference to his coworkers, but the agreed facts state that Frank did not share a copy of the email with anyone or tell anyone that he was going to send the email, nor did he receive permission from any of his coworkers to send the email on their behalf. Although his email arguably related to a matter of public concern, it is more correctly characterized as a gripe about his compensation and the furlough policy. Its references to employees being "peeons," euphemisms, and blatant frustration with the County's compensation levels further support the conclusion that the email was authored by an upset employee. Frank's speech was not made by a citizen on a matter of public concern—it was an employee grievance. The analysis ends here.

5. **CONCLUSION**

The Court need not balance the public interest against Frank's First Amendment rights, discuss the scope of § 1983 liability, or analyze qualified immunity. The first prong of the *Connick-Pickering* test is dispositive. For the reasons explained above, the Court will grant Defendants' motion for summary judgment. Frank's claims are dismissed with prejudice.

Accordingly,

**IT IS ORDERED** that Defendants' motion for summary judgment, ECF No. 29, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Plaintiff's claims be and the same are hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED.**

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 31st day of May, 2022.

BY THE COURT:

_____
J.P. Stadtmueller
U.S. District Judge